**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**GERARDO DAVILA** **PLAINTIFF**

**V.** **CASE NO. 4:25-cv-00845-LPR**

**CONWAY SCHOOL DISTRICT** **DEFENDANT**

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Gerardo Davila ("Davila"), by and through his attorneys, Cox, Sterling, Vandiver & Botteicher, PLLC, for his Response to Defendant's Motion for Summary Judgment, alleges and states:

## I. STATEMENT OF DISPUTED FACTS

Please see Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Plaintiff's Statement of Additional Material Facts, incorporated by reference.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is inappropriate when the nonmoving party sets forth specific facts showing a genuine issue for trial, and the movant bears the burden of showing the absence of such an issue. *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the evidence most favorably to the nonmovant and may not weigh evidence or make credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

## III. ARGUMENT

USERRA prohibits an employer from denying a service member "retention in employment" or any "benefit of employment" on the basis of his membership or application for membership in a uniformed service. 38 U.S.C. § 4311(a). Section 4311(b) provides that an employer "may not discriminate in employment against or take any adverse employment action *or other retaliatory action* against" a person who has taken action to enforce a protection afforded

under the chapter. 38 U.S.C. § 4311(b). The final four words were added effective January 2, 2025. Pub. L. No. 118-210, § 221(b), 138 Stat. 2778. An employer violates the statute if military status or protected activity "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of" it. 38 U.S.C. § 4311(c).

The District recites the first half of that framework and omits the second. USERRA does not use the *McDonnell Douglas* scheme. Once the employee shows his service was a motivating factor, the burden of persuasion shifts to the employer to prove its only affirmative defense, that it would have acted the same way regardless. *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 551 (8th Cir. 2005). Motivation may be inferred from hostility toward service members coupled with knowledge of the military activity, temporal proximity, inconsistencies between the proffered reason and the employer's other actions, and disparate treatment of employees with similar records. *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1011 (8th Cir. 2011); *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001).

## A. Davila's enlistment and his complaints were a motivating factor.

### *1. The District's head of human resources was recorded discussing the enlistment.*

The District addresses only Davila's deposition paraphrase of a meeting with Dr. Karen Lasker and calls it "insufficient as a matter of law." Doc. 15 at 7. It never mentions that the meeting was recorded, that the transcript was marked as Exhibit 2 to Dr. Lasker's deposition, or that she testified about it. In December 2024 the District's then-head of human resources told Davila that an outside application "needed a recommendation from your immediate supervisor," that this was "concerning . . . because the reserve is probably federal stuff that has to happen," that "they have already told you. So that relationship is gone," that "[y]our immediate supervisor has not cleared you for certain things. That's pretty bad," and that "[t]he ball is moving fast." Lasker Dep. 55:15-59:25 & Dep. Ex. 2. She confirmed the "immediate supervisor" was Principal Yates, did not know why the relationship was already "gone," and answered "I have no idea" when asked what had led to the ball moving toward termination. Lasker Dep. 57:14-23; 58:22-24.

The District has never contended the recording is inaccurate, and it is in no position to. Dr. Lasker testified that she had not listened to the recordings produced in this case. Lasker Dep. 49:14-16. Handed a transcript of a six-minute excerpt, she asked whether it had "been altered." Lasker Dep. 50:16-19; 53:24-25. The complete recording had been produced to the District months before her deposition. *Id.* at 50:20-21. Her question has a simple answer. The transcript begins mid-conversation because it is an excerpt, taken from about 37 minutes into a 63-minute recording, and Davila, who made the recording and was present for all of it, authenticates both. Ex. H ¶¶ 19-20.

Statements by individuals closely involved in employment decisions may constitute direct evidence of animus. *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991). Dr. Lasker hired Davila, ran human resources and the discipline process, fielded his complaints, and testified the write-ups "added to the reason" for the nonrenewal. Lasker Dep. 20:1-6; 41:8-15. The District also admits it refused him a favorable recommendation to the Air Force Reserve, giving the same rationale it offers for the nonrenewal. Def.'s Interrog. Resps. Nos. 8, 15. She named the reserve recommendation as the problem and warned in the same conversation that the ball was moving fast. A jury may find military service was on the District's mind. This is not *Rademacher*, where the employer expressed "initial frustration" and thereafter handled the plaintiff's absences "without comment or incident." 645 F.3d at 1011.

Remarks are stray only when they lack a nexus to the challenged decision, and a supervisor's statement made in direct response to an employee's question about an adverse action is direct evidence rather than a stray remark. *Porter v. Trans States Holdings, Inc.*, No. 24-1486, 2025 U.S. App. LEXIS 34105, at *14-17, *19 (10th Cir. Dec. 31, 2025) (unpublished) (reversing summary judgment under USERRA, and holding that regardless of whether the speaker was "a decisionmaker or simply knew about the reasons," the "causal chain remains unbroken").

***2. The District's chronology omits material events.***

The District measures time from Davila's March 2024 text message to the April 2025 nonrenewal and announces a thirteen-month gap. Doc. 15 at 7. A more precise timeline is below:

| | |
|---|---|
| **March 2024** | Davila tells Yates he is enlisting for the 2025-2026 school year. Yates congratulates him. Yates Aff. ¶ 5. |
| **Sept. 12, 2024** | Yates issues two notices of concern in one day. Yates Aff. ¶ 7. |
| **November 2024** | Davila learns Yates declined to recommend him to the Air Force Reserve, and reports to Dr. Lasker and Ms. Campbell that he is being discriminated and retaliated against. Ex. H ¶¶ 15-18; Davila Depo. (Def.'s Ex. 1) at 17:19-18:3. |
| **Dec. 5, 2024** | Yates issues a disciplinary letter. Yates Aff. ¶ 8. |
| **December 2024** | In the recorded meeting Dr. Lasker tells Davila "that relationship is gone," "[t]he ball is moving fast," and that his "only recourse" is a rebuttal that "really doesn't stop anything." Lasker Dep. 55:15-63:1 & Dep. Ex. 2. |
| **Jan. 22, 2025** | Davila is placed on administrative leave over the glasses. Its results are never given to him, nothing enters his personnel file, and he returns to work. Lasker Dep. 85:5-8; 87:1; 91:14-25. |
| **Jan. 31, 2025** | Yates issues two more disciplinary letters in one day. Yates Aff. ¶¶ 9-11. |
| **Feb. 18, 2025** | Davila submits written rebuttals. They are not investigated. Ex. F; Lasker Dep. 63:7-11; 89:4-6. |
| **April 5, 2025** | Davila enlists in the Air Force Reserve. Davila Depo. (Def.'s Ex. 1) at 18:10-14. |
| **April 10, 2025** | The Superintendent's two-sentence letter, stating no reason, ends nine years of employment. Yates Aff., Ex. 3-7. |
| **April 14, 2025** | The District explains the decision by handing Davila the write-ups. Yates says he does not give such documents to human resources. Ex. G. |
| **April 29, 2025** | Davila emails the Superintendent, invokes USERRA, and asks to address the board in an open hearing. Ex. I. |
| **May-June 2025** | While Davila is at basic training, the District rejects his application for his former position in favor of a candidate who applied ten days before he did. Def.'s Interrog. Resps. No. 14. |

The intervals are short. Eight weeks separate the December complaint from the January 31 write-ups, the suspension came nine days before those write-ups, and the letter ending a nine-year employment issued five days after Davila enlisted. The District's records show no discipline from March 2023 to September 2024, then five write-ups in the five months surrounding the recorded December meeting. Davila complained in person and in writing, and Dr. Lasker confirmed neither had any effect. Rebuttals are never investigated, she took no action on the February 18 rebuttals,

and she never followed up with Yates. Lasker Dep. 61:5-63:16; 69:10-15; 75:3-7; 90:1-8. Viewed most favorably to Davila, that proximity creates a genuine issue of material fact.

***3. Similarly situated registrars were treated differently.***

The District employs three other middle-school registrar bookkeepers in the same position, district, and policies. They are Heather Mears, Natalie Schuetzle, and Laura Stephenson. It swore they never exhibited the behavior it attributes to Davila. Def.'s Interrog. Resps. Nos. 16-18. Their testimony contradicts that answer.

Davila was disciplined repeatedly between September 2024 and January 2025 for not uploading registration documents. Mears uploads birth certificates into September and October, sometimes taking "a couple months," because no timeline has ever been given, and she routinely sends home language surveys home with students, the very conduct for which Davila was written up. Mears Dep. 22:9-25; 24:12-22; 27:19-28:8. At the other schools the principal or counselor steps in when documents cannot be obtained. Mears Dep. 12:1-6; Stephenson Dep. 21:21-22:14. No two bookkeepers handle missing documents alike. Mears was told "we've got to get these students in" and registers during a grace period. Mears Dep. 10:14-25. Schuetzle holds registration entirely, because a student "will not be registered if the survey is not completed." Schuetzle Dep. 22:1-25. Stephenson tells parents she "cannot complete" registration without the required proof. Stephenson Dep. 21:13-20. Dr. Lasker did not think a student could be enrolled without a birth certificate at all. Lasker Dep. 66:17-19.

None of those conflicting practices drew discipline. Davila was written up twice over birth certificates for students the District had already enrolled. Lasker Dep. 66:20-67:7. He had raised the problem himself, asking in a September 12, 2024 email whether screeners could be sent home when "some parents only complete the registration online and do not come in person," and emailing the District's liaisons in August 2024 about enrolling students who lacked documentation. Those questions went unanswered, and Dr. Lasker was hearing his concerns for the

first time at her deposition. Doc. 14-3 at CONWAY SD; DAVILA 037; Lasker Dep. 34:19-35:3; 75:8-76:8.

Refusing enrollment was not a lawful option. A public school district may not deny children enrollment based on immigration status, *Plyler v. Doe*, 457 U.S. 202, 230 (1982), and longstanding federal guidance instructs districts that they may not bar or discourage enrollment because a family cannot produce documents such as a birth certificate or social security number. *See* U.S. Dep'ts of Justice & Educ., Dear Colleague Letter: School Enrollment Procedures (May 8, 2014). The guidance Davila circulated in August 2024 was, on the face of his own email, "a document shared during registration training," together with a federal ".gov" document. Ex. J (CONWAY SD; DAVILA 308); Lasker Dep. 75:8-25. The Deputy Superintendent could not say Davila could have refused to enroll a student whose family lacked documentation. Lasker Dep. 93:18-20. A write-up that punishes an employee for meeting the District's own legal obligation is not a legitimate performance reason.

Davila also worked at the one middle school housing the sheltered program, where most enrolling families primarily speak Spanish and documents are hardest to obtain. He was the only registrar who interpreted for families, and the only one whose principal answered missing parent documents by writing him up rather than helping. Mears Dep. 33:8-18; Lasker Dep. 45:8-13; 47:20-48:10. Disparate treatment of employees "with similar work records or offenses" is classic evidence of discriminatory motivation. *Sheehan*, 240 F.3d at 1014.

**4. *The stated reasons conflict with the District's own documents.***

A factfinder may infer unlawful motivation from disbelief of the employer's explanation. *Reeves*, 530 U.S. at 147-48. Pretext may be shown where the reason has no basis in fact, where the employer changed its explanation, or where it deviated from its own policies, *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006), and a failure to fairly investigate the violation that purportedly led to the adverse action supports the same inference, *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014). The April 10, 2025 letter states no reason, and the

"continuing performance deficiencies" rationale appears nowhere contemporaneous with the decision. Yates Aff., Ex. 3-7; Def.'s Interrog. Resps. No. 8.

**The September 12, 2024 timesheet notice.** Payroll emailed four District employees on a Saturday that a timesheet was missing for Shakeria Lewis, a newly hired paraprofessional. Monday morning Yates directed Davila to obtain it. Davila answered that he had submitted Courtway's payroll the previous Wednesday and asked in writing, "Who is Shakeria Lewis and where is she located?" Payroll replied that she was "a new para in your building." He found her, obtained the signature, and delivered the timesheet that morning. Three days later Yates issued the notice. Doc. 14-3 at CONWAY SD; DAVILA 039-041. Dr. Lasker knew of no evidence the problem had arisen before, none that anyone told Davila about the new hire, and no instance of his being written up for a timesheet again. Lasker Dep. 25:9-17; 29:12-14; 71:1-7; 73:18-74:2. Davila had completed payroll for sixty-two months without a known error. CONWAY SD; DAVILA 107-108 (Exhibit F).

**The September 12, 2024 home-language-survey notice.** The ESOL director flagged a missing Home Language Usage Survey at 4:44 p.m. on September 11. Davila reached the parent that evening, the mother completed the survey by 9:55 the next morning, and the ESOL director wrote back at 10:40 a.m., "Thank you Mr. Davila." Yates issued the notice that afternoon. Doc. 14-3 at CONWAY SD; DAVILA 036-038. Its premise was that the delay left the District "outside the time line window." *Id.*; Lasker Dep. 38:12-15. But the student registered the week of August 12-16, and Dr. Lasker agreed it "[s]eem[ed] that way" that thirty days had not passed. Lasker Dep. 37:19-25. She was not familiar with the survey process, did not investigate, and knew of no other registrar disciplined over one. Lasker Dep. 34:3-17; 35:5-16. Asked whether the notice was proper, she could say only that it was "[b]ecause Mr. Yates felt like he needed to give him a notice of concern," and gave the same answer when asked whether that held even if the notice rested on incorrect information. Lasker Dep. 40:8-13; 41:2-7. Davila had told them as much, writing, "You never asked me about this before you wrote me up." CONWAY SD; DAVILA 152 (Exhibit F).

**The December 5, 2024 reprimand and its January 31, 2025 repetition.** Both concerned birth certificates parents failed to provide, which Davila reported to Tiffany Stroman and to Yates. Lasker Dep. 67:8-68:7. When the Director of Accountability asked Yates to "assist us with receiving the requested documents," Yates instead disciplined Davila thirteen days later, and Dr. Lasker agreed the emails show no step Yates took to help. Doc. 14-3 at CONWAY SD; DAVILA 055-057; Lasker Dep. 47:20-48:10. At the other middle schools the principal takes over. Mears Dep. 12:1-6. Yates wrote Davila up again on January 31 over the same students, and Dr. Lasker agreed a second write-up on the same issue "is not usual," appropriate only "if the issue has not been resolved." Lasker Dep. 66:20-67:7. The issue could not be resolved. The parents had not provided the birth certificates, and Davila could not condition enrollment on them. Twenty-one school days separated the letters, eleven of which Davila spent on leave or without system access. CONWAY SD; DAVILA 153, 114 (Exhibit F). The January 31 letter is dated 2024, an error Yates repeated aloud on April 14. Ex. G at 4:14. The District still cannot say what Davila was supposed to do to get documents he could not lawfully demand as a condition of enrollment.

**The January 31, 2025 smart-glasses charge.** The District says this write-up reflects a FERPA risk. The record supports no such thing. Davila had worn the glasses since late October, and Yates asked about them in early December and was told they had a camera. Only in January, after Davila complained to human resources, was he disciplined. CONWAY SD; DAVILA 112 (Exhibit F). He offered to synchronize the glasses and show the District everything on them, and the District declined. He attached the photographs to his rebuttal, and the District never looked. Lasker Dep. 88:15-25; 90:9-17. Dr. Lasker conceded there is no evidence a student record was photographed and knew of no other employee disciplined for a FERPA violation that year. Lasker Dep. 86:17-23; 87:19-24; 88:1-7; 89:11-13; 92:10-23. Each comparator carries a camera phone, none has heard of anyone disciplined over smart technology, and Yates told his own staff to use personal smartphones rather than school radios to coordinate student check-outs. Mears Dep. 35:1-19; Schuetzle Dep. 31:14-32:5; CONWAY SD; DAVILA 113 (Exhibit F). The investigation

identified no student and no document, Davila returned to work with the discipline still in his file, and Dr. Lasker confirmed it counted toward the nonrenewal. Lasker Dep. 91:4-6; 91:14-25.

**The recommendation the District refused.** Yates learned of the enlistment in March 2024 and answered with congratulations, and the District offers those texts as proof it bore Davila no ill will. Yates Aff. ¶ 5 & Ex. 3-2. But Davila learned in November 2024 that Yates had declined to support him, Ex. H ¶¶ 15-17, and by December Dr. Lasker was confirming it. Lasker Dep. 55:15-59:25 & Dep. Ex. 2. According to the recruiter, Yates said he could not give a reason for declining. Ex. H ¶ 16. The reasons came later. In discovery the District answered that the same rationales produced both the nonrenewal and the negative recommendation. Def.'s Interrog. Resps. Nos. 8, 15. The record contradicts that. Three of the five items the District calls a pattern had not happened yet when the recommendation was refused. Those are the glasses charge, the second birth-certificate write-up, and the administrative leave. The only discipline then on the books was the two September notices, and the District's own emails contradict both.

**The grievance the District says he never filed.** At the May 28, 2025 meeting the District's general counsel told Davila the board had "already approved the list," that this is why he "got the letter in April," and that "there was a point in time to grieve, and that has already passed." Dr. Lasker adopted that position under oath. Asked what the deadline was, she answered, "I'd have to look at the policy. I don't remember." Lasker Dep. 79:18-80:5. Davila had already asked. On April 29, 2025, nineteen days after the nonrenewal letter, he emailed Superintendent Jeff Collum directly, invoked "the USERRA Act protections" by name, and closed by writing, "If you do not feel that I have a recourse for rehirement I would like to address the board in an open hearing." Ex. I. He wrote again on May 18 under the subject line "2nd attempt for hearing." *Id.*; Ex. H ¶ 21. Ten days later the District told him his time had run. An employer that enforces a deadline it cannot state, against an employee whose termination letter gave him nothing to contest, has not offered a reason a jury must accept.

The policies the write-ups invoke do not fit either. Each letter recites handbook provisions, 8.40, 8.48, 8.22.2, and 4.13, without identifying what Davila did to violate them, and his written requests for the provision and the supporting documentation went unanswered. CONWAY SD; DAVILA 113-114, 153-155 (Exhibit F). Section 8.22.2 governs social-networking accounts with students, and 8.40 governs interpersonal boundaries with students. The instrument used to build the file is not in the handbook at all. The notice of concern appears in no policy, the practice began around 2023, and the documents are held by the principal at the building level, outside the personnel file, "until it's time to use them." Lasker Dep. 19:6-19; 20:1-16; 26:11-15. Policy 8.2, which does govern classified employees, provides that each will be evaluated and informed of the results and affords a right of appeal, yet the District destroys those evaluations each year and has none for Davila. Lasker Dep. 12:9-16:25 & Dep. Ex. 1. The file preserved every negative document created outside the handbook and none of the evaluations the handbook required for a nine-year employee. Deviation from an employer's own policies is itself evidence of pretext. *Stallings*, 447 F.3d at 1052.

***5. The District's explanations have not held still.***

The District's account also changed with the speaker and the setting. The May 28, 2025 meeting was transcribed, marked as Exhibit 3 to Dr. Lasker's deposition, and examined at length.

Asked there whether the recording device the District found after the nonrenewal was "the main grounds for him not being able to come back," counsel answered that it was not, and that "the main ground is really a totality of things. It's all the write-ups he received for not performing his registration duties, not performing his bookkeeping duties." Dr. Lasker agreed. Lasker Dep. 80:6-15. At her deposition she was less certain about those same write-ups, saying of the home-language-survey notice that she "can't tell you that was, you know . . . but it's accumulation of things," and later that it "could be" part of the reason. Lasker Dep. 34:1-2; 41:10. Asked how many such items it takes, she said only that there is no set number and that "it depends." Lasker Dep. 80:16-23.

She also said the District had "sent people out to help." Asked what they did, she named Mr. Darley, Ms. Stroman, and Ms. Reynolds, then said, "I don't know specifically because I don't get that deep in the information." Lasker Dep. 82:1-18. Asked whether she had ever seen Yates give Davila the help he needed, she answered, "I haven't seen it." Lasker Dep. 81:19-23. She said that over "the last few months . . . things have just really escalated faster than I can even imagine," and when asked what had escalated, answered, "Behaviors." She identified them as Davila declining to speak with her, "avoidance," and an office she saw "in array" and "very disheveled." Lasker Dep. 82:19-83:21. None of that appears in a write-up, an interrogatory answer, or either affidavit the District filed. It surfaced for the first time in this litigation, and it is not the reason the District gives now.

On the question this case turns on, Dr. Lasker did not claim otherwise. Describing when the documentation began, she said, "And then it started after that. I can't promise you it started after him . . . after he told him he was wanting to do this because I wasn't privy to that conversation." Lasker Dep. 78:11-14. The Deputy Superintendent cannot rule out that the write-ups began after Davila told his principal he was enlisting. She also testified that Yates raised Davila with her once in the entire 2024-2025 school year, "[m]aybe December, November, December, latest possibly January," though the file the District relies on opens in September. Lasker Dep. 79:10-17. No one reconciled any of it, because "once they're written on paper, it's not my job to go and try to investigate or dispute what the principal or the supervisor says," and rebuttals are not investigated at all. Lasker Dep. 62:2-11; 63:7-16. On this record a jury could find the District does not know why it did what it did, which alone defeats a motion on which the District bears the burden.

**B. The District cannot carry its same-decision burden.**

Because § 4311(c) places the burden of persuasion on the employer, an employer seeking summary judgment must establish that defense as a matter of law. *Maxfield*, 427 F.3d at 551; *Sheehan*, 240 F.3d at 1014. The Supreme Court has said the same in the USERRA setting. Where an employer contends its own investigation produced the adverse action "for reasons unrelated to

the supervisor's original biased action," "by the terms of USERRA it is the employer's burden to establish that." *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011). The District's brief never addresses the defense. It addresses only Davila's threshold showing.

The Superintendent made the nonrenewal, yet the District submitted no affidavit from him and declined in discovery to identify the individuals involved or their roles. Def.'s Interrog. Resps. Nos. 9-10. The only evidence connecting the performance file to the decision is paragraph 12 of the Yates affidavit, a former principal characterizing what the Superintendent did and why. An affidavit supporting summary judgment "must be made on personal knowledge," Fed. R. Civ. P. 56(c)(4), and Yates does not claim to have made, joined, or witnessed that decision. Paragraph 12 should be disregarded. Fed. R. Civ. P. 56(c)(2).

Even crediting it, an employer is liable under USERRA where a supervisor's biased acts are intended to cause, and proximately cause, the ultimate employment action, particularly where no independent investigation occurs. *Staub*, 562 U.S. at 419-22. The Eighth Circuit is to the same effect. A biased subordinate who lacks decisionmaking power may "use[] the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action," *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006)), and an employer cannot shield itself by interposing a decisionmaker who "merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design," *Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006) (quoting *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003)).

Yates authored every input to the decision. Dr. Lasker's office passed them along. No one checked them against Davila's rebuttals. Lasker Dep. 62:2-63:11; 89:4-6. On April 14 the District explained the nonrenewal by having Yates present the documents he had written, and when Davila asked whether he was being given the reason in writing, Yates pointed to the write-ups and said, "I think these are the reasons." Ex. G at 5:11-14. Yates swore one thing and said another in the room. That alone makes the stated reasons a jury question. *Porter*, 2025 U.S. App. LEXIS 34105, at *23. And once unlawful motivation is shown to be *a* motivating factor, "the presence of additional

legitimate motives will not entitle the defendant to summary judgment," because mixed motives are "trial issues, not summary judgment issues." *Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004).

An employer carrying the § 4311(c) burden must show what it actually considered and why, "as a matter of uncontroverted fact." *Porter*, 2025 U.S. App. LEXIS 34105, at *20. The District submitted two affidavits, and neither is from a decisionmaker on the nonrenewal. Dr. Lasker's speaks only to a June 2022 incident and says nothing about the enlistment, the write-ups, the rebuttals, the nonrenewal, or the refusal to rehire. Doc. 14-2. The District offers nothing from the Superintendent who signed the letter and nothing from the Director of Human Resources who received Davila's complaints, and no contemporaneous writing stating a reason, because the April 10 letter states none. It ignores two recorded conversations it has held all along, in which its own officials answer the questions this motion asks. And asked to produce its policies on military leave and anti-discrimination protections for service members, it identified none and answered only that it "fully adheres to all federal and state laws," an assurance no policy, training, or posting in the record supports. Def.'s Interrog. Resps. No. 11 & RFP No. 8; Lasker Dep. 93:21-24. Whether the District would have nonrenewed Davila, the nine-year employee it called the pride and joy of its hiring, absent his service is a fact question.

**C. The 2022 and 2023 incidents do not warrant judgment.**

The District leads with a 2022 written warning and a 2023 notice of concern, mainly to impeach an allegation in the Complaint. It renewed Davila's contract after each of them, twice after the 2022 warning, and its Deputy Superintendent thereafter called him a hard worker and the "pride and joy" of her hiring. Lasker Dep. 76:24-78:10. The only renewal cycle he ever lost was the one that followed his complaints and his enlistment.

The District cannot have it both ways. If those incidents warranted ending Davila's employment, it would have ended his employment in 2022 or 2023. It renewed him three times instead. An employer that lives with conduct through three contract cycles and reaches back for it

in the fourth is not explaining why it acted. It is looking for a reason. That matters more here because the District carries the § 4311(c) burden. Conduct it tolerated for three years cannot prove it would have reached the same decision anyway. What is new in 2025 is the five write-ups, and the District's own documents contradict every one. Tolerance of allegedly more serious pre-notice conduct, followed by nonrenewal over contested paperwork after notice, is itself an inconsistency a jury may weigh. *Rademacher*, 645 F.3d at 1011.

Nor is the allegation what the District says it is. Paragraph 7 alleges that Davila regularly reviewed his personnel file and "did not have any disciplinary actions in his employment file," and the Deputy Superintendent confirmed that notices of concern are not placed in the personnel file at all but held by the principal "until it's time to use them." Compl. (Doc. 1) ¶ 7; Lasker Dep. 17:18-19; 20:1-16; 22:2-5. On the District's own account the 2023 notice was never in the file to be found. As for the 2022 warning, Davila testified in the excerpts the District itself filed that when he requested his personnel file the warning "was not included" and that "[h]uman resources was holding onto that information until it was convenient to them." Davila Depo. (Def.'s Ex. 1) at 37:23-38:3; 39:19-21. Dr. Lasker's description of the District's file-keeping corroborates him, because building-level discipline reached Central Office only when Yates left and when investigations began. Lasker Dep. 24:14-19; 27:22-28:1.

The April 14 recording corroborates him further. When Yates produced the March 7, 2023 notice, Davila answered on the spot, "That was not in my file, in my personnel file at [Courtway] or here at Central Office." Ex. G at 4:2-4. He repeated it three times. *Id.* at 8:12-14; 9:17-19; 10:24-11:1. Yates did not dispute that the document was missing from the copy Davila had been given, answering only that he thought he had "provided a copy then as well," *id.* at 4:12-13, and Ms. Campbell cut the exchange off, saying, "we're not going to go back and forth in argument here." *Id.* at 9:1-2. Yates then explained why. Asked whether the document had ever gone to human resources, he answered, "I don't provide any of these to HR," after another voice in the room said, "We don't get those." *Id.* at 8:8-11. He drew the line expressly, saying, "writeups come to Central Office. Notice of concerns is housed with me." *Id.* at 6:14-16. The principal who wrote the

documents and the Deputy Superintendent who runs human resources describe the same filing practice, and it is the practice Paragraph 7 describes. What the file held when Davila reviewed it is at least a disputed question of fact, and what weight the pleading deserves is at most a credibility argument for cross-examination. *Reeves*, 530 U.S. at 150-51.

**D. The retaliation and refusal-to-rehire claims independently survive.**

Section 4311(b) makes it unlawful for an employer to "discriminate in employment against or take any adverse employment action *or other retaliatory action* against" a person who has taken action to enforce a protection afforded under the chapter. 38 U.S.C. § 4311(b). The last four words are new. In a provision captioned "Prohibition of Retaliation," Congress amended § 4311(b) "by inserting 'or other retaliatory action' after 'employment action.'" Pub. L. No. 118-210, § 221(b), 138 Stat. 2778. It did not rewrite the subsection. It reached into a prohibition that already barred discrimination in employment and already barred adverse employment actions, and it added a third category.

The insertion must do something. If "other retaliatory action" reached only conduct that already qualified as an adverse employment action, the amendment would have changed nothing and Congress would have captioned an empty provision a prohibition of retaliation. The word "other" confirms the reading. It treats discrimination in employment and adverse employment actions as forms of retaliatory action and extends the statute to the rest.

The District relies on *Lisdahl v. Mayo Foundation*, 633 F.3d 712, 721 (8th Cir. 2011), and *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019), for the proposition that only a materially adverse employment action is actionable. Doc. 15 at 5. Both construe the statute as it read before January 2, 2025. Neither had occasion to consider text Congress had not yet enacted, and the District offers no authority construing the statute it was actually sued under. The Court can deny this motion without deciding how far the new language reaches, because nonrenewal and refusal to rehire are materially adverse under any standard. But the added words are not ambiguous, and the District's reading would delete them.

Davila complained to Dr. Lasker and Ms. Campbell in November or December 2024 that he was being discriminated and retaliated against, Davila Depo. (Def.'s Ex. 1) at 17:19-18:3, and on February 18, 2025 submitted written rebuttals copied to Lasker, Campbell, Darley, and Bennett, stating he was being targeted and referencing the District's refusal of his Air Force recommendation. Ex. F. No one investigated. Lasker Dep. 89:4-6; 90:1-8. Both women were in the room on April 14 when the District explained the nonrenewal by handing him Yates's write-ups, and neither mentioned his complaints. Ex. G at 2:2-14; 5:11-14. He kept complaining afterward, emailing Superintendent Collum on April 29, 2025, invoking USERRA by name, and asking to address the board, then writing again on May 18. Ex. I; Ex. H ¶ 21.

Seven weeks after the rebuttals he was nonrenewed, and weeks later, while he was at basic training, the District rejected his application for his own former position in favor of a candidate with no registrar experience who had applied ten days before he did. Def.'s Interrog. Resps. No. 14 (CONWAY SD; DAVILA 610-943). The District offers no evidence on that decision. Its Statement of Facts cites Davila's own deposition and nothing else, and no one who selected his replacement submitted an affidavit. Doc. 16 ¶ 25. The refused recommendation does not depend on the amendment at all. Section 4311(a) forbids denying a service member "any benefit of employment" on the basis of his service, and § 4303(2) defines that term to mean "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest." A supervisor's recommendation to a prospective employer is an advantage, a privilege, and an interest within that definition. The District admits it withheld the recommendation for the same contested performance reasons it gives for the nonrenewal. Def.'s Interrog. Resps. No. 15. That states a claim under § 4311(a) on the statute's own terms, and USERRA is to be "broadly construed in favor of its military beneficiaries." *Maxfield*, 427 F.3d at 551 (quoting *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 312-13 (4th Cir. 2001)). Each of these actions presents its own triable claim.

## IV. CONCLUSION

WHEREFORE, Plaintiff prays that this Court deny the Motion for Summary Judgment, and for all other just and proper relief to which Plaintiff may be entitled.

Respectfully submitted,

Dylan J. Botteicher (Ark. Bar No. 2017170)
COX, STERLING, VANDIVER
& BOTTEICHER, PLLC
8201 Cantrell Road, Suite 330
Little Rock, AR 72227
Phone: (501) 954-8073
djbotteicher@csmfirm.com
ATTORNEY FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2026, I electronically transmitted the foregoing to the following via ECF:

Jay Bequette
W. Cody Kees
Phillip M. Brick, Jr.
Bequette, Billingsley & Kees, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201

Shastady R. Wagner
Conway School District
2220 Prince Street
Conway, AR 72034

Dylan J. Botteicher (Ark. Bar No. 2017170)